UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
CECIL RICHARDSON,                    :

              Petitioner,   :     **REPORT & RECOMMENDATION**

         -against-          :     13 Civ. 672 (WHP)(MHD)

JOSEPH BELLNIER,                     :
Superintendent,
Marcy Correctional Facility,         :

           Respondent.      :
------------------------------x

                                    12/23/13

**TO THE HONORABLE WILLIAM H. PAULEY III, U.S.D.J.:**


     Petitioner Cecil Richardson seeks a writ of habeas corpus under 28 U.S.C. § 2254 to challenge his 2009 conviction in New York State Supreme Court, New York County, following his guilty plea to one count of robbery in the second degree. The court sentenced petitioner to a prison term of seven years, to be followed by five years post-release supervision.


     In his timely petition, Richardson asserts a single ground on which he claims he is being held unlawfully. He argues that during the trial that preceded his guilty plea, the court declared a mistrial without any "manifest necessity" and that the Double Jeopardy Clause of the Fifth Amendment therefore barred his further prosecution.

For the reasons that follow, we recommend that the writ be denied and the petition dismissed with prejudice.

## I.   **Background**

At approximately 6:00 p.m. on March 4, 2007, Richardson confronted Masayasu Nakanishi on the corner of West 46th Street and Sixth Avenue in Manhattan, while holding what appeared to be a knife, and stated, "Give me your money or I'll cut your throat." (Plea Tr. ("Plea") at 17). Nakanishi complied with Richardson's demand and handed over his wallet. Id. Two days later, Richardson was arrested and subsequently charged under New York County Indictment Number 1425/07 with a single count of robbery in the first degree.

## II.  **PROCEDURAL HISTORY**

### A. Trial Proceedings

On August 27, 2007, petitioner proceeded to trial before the Hon. William Wetzel, S.C.J. and a jury. The presentation of evidence concluded on August 28, 2007. On August 29, the judge charged the jury and dismissed the alternate jurors, and the jury began deliberations.

After some hours of deliberation, the jury reported to the judge that it was "deadlocked." (Tr. at 117). At that point, the court delivered an <u>Allen</u> charge directing the jury to continue its deliberations. (<u>Id.</u> at 116-19); <u>see</u> <u>Allen v. United States</u>, 164 U.S. 492 (1896). Sometime thereafter, the jury requested a read-back of certain testimony. (<u>Id.</u> at 119). Due to the late hour, the court decided to adjourn for the day and instructed the jurors to return the next morning, August 30, 2007, at 9:30 a.m. (<u>Id.</u> at 119-20).

The next morning, one of the jurors (referred to as "Juror Three"), who at the time was in her last trimester of pregnancy, failed to appear in court. (<u>Id.</u> at 121). In a telephone conversation with Justice Wetzel, Juror Three informed the court that she had a low-grade temperature and was feeling weak. (<u>Id.</u> at 121-22). The judge offered her some time to rest and the services of a court officer to drive her to and from the court, or, in the alternative, reimbursement for her to take a taxi. (Aff. of Hon. William Wetzel, dated Nov. 29, 2007 ("Wetzel Aff.") at ¶ 7). Juror Three, however, informed the judge that "she would not be able to return to the courthouse for deliberations at anytime, whether that date or the following week because she was totally weak... she had a troubled pregnancy and [she] was not going to jeopardize her pregnancy...

3

[Moreover] the tension in jury deliberations w[as] exacerbating her current problems." Id.

Since the alternate jurors had already been dismissed, Juror Three's vacant position could no longer be filled. Additionally, the defense attorney refused to consent to proceed with eleven jurors. (Aff. of Daniel Boylan, dated Nov. 28, 2007 ("Boylan Aff.") at ¶ 4). Ultimately, the judge declared a mistrial, over the defendant's objection. (Tr. 122).

The following colloquy, reflecting Justice Wetzel's decision, took place on the record:

> THE COURT: This morning we got a call from juror number three Miss Valero indicating she felt ill, the woman is in her last trimester of her pregnancy. I spoke to the juror myself in an effort to persuade her to come down for at least a couple of hours. She was very, I believe, very sincere and sympathetic, but she said she feels she has a low grade temperature, she feels very weak, that it would be a strain for her to come down, she doubted her ability to really participate and the bottom line is that she's just not physically able to come down, she doesn't see that changing in the next day.
>
> We also, I'm aware, have jurors who had informed us they have commitments this evening to fly out of town. There's no alternative, in my opinion, here but to declare a mistrial.
>
> Does the defense wish to be heard?
> [DEFENSE COUNSEL]: Judge, just for the record, going forward, the defense objects to not having the

4

delay, I understand the circumstances supported by the Court, I've talked to the defendant about the procedure and how this normally goes, but I object, for the record, in case there is an appeal issue later on.

THE COURT: All right, mistrial declared. Thanks a lot.

(Id. at 121-22).

## B. The Article 78 Proceeding

On October 17, 2007, petitioner filed an Article 78 petition in the Appellate Division, First Department, seeking to bar retrial of his criminal case. He argued that the Court's declaration of a mistrial was not required by "manifest necessity", and that the Double Jeopardy Clause therefore barred a retrial. (Pet'r's Art. 78 Pet. ¶ 15). Justice Wetzel and the District Attorney filed separate answers. Along with his answer, Justice Wetzel submitted an affidavit, in which he amplified his on-the-record statements as follows:

During the morning of the next day, August 30th, I had a telephone conversation with Juror #3, Miss Valero, when she called the courtroom indicating her inability to continue jury deliberations. During the conversation, Miss Valero indicated that she was not feeling well with her pregnancy in her last trimester, and had a temperature. I inquired as to whether rest for a few hours would alleviate the situation and volunteered to either have court officers come to her

residence and drive her to and from her home and the courtroom or, in the alternative, for her to catch a cab or have a car service transport her to and from home and the courtroom for which the court would reimburse her. Miss Valero advised me that she would not be able to return to the courthouse for deliberations at anytime, at that date or the following week because she was totally weak and debilitated, she had a troubled and problem pregnancy and she was not going to jeopardize her pregnancy and was adamant that the tension of the jury deliberations w[as] exacerbating her current problems and she would not subject herself again to jury deliberations.

After the telephone conversation, I went to the courtroom and on the record before counsel and the parties I summarized the details of my telephone conversation with Miss Valero and advised everyone that a mistrial was appropriate since Miss Valero, Juror #3, would not be available in the foreseeable future. I noted that one other juror had a travel commitment to fly out of town that evening in view of Labor Day weekend, and the alternates were already dismissed at the conclusion of the jury charge. Defense counsel objected to not having the delay "in case there is an appeal issue later on"... I then declared a mistrial.

(Wetzel Aff. ¶¶ 7-8).[1]


The District Attorney also submitted an affirmation from the prosecutor. He recounted that at trial, on the morning of August 30, 2007, Justice Wetzel had informed both counsel that he had just spoken by telephone with Juror Three, who had stated that she "was in the third trimester of pregnancy, was anxious

---

[1] Petitioner objected to the admission of the affidavit as containing matters outside of the record. (Pet'r's Letter to the Ct., dated Dec. 7, 2007).

and stressed by the deliberations, and was concerned about the effect her continued participation would have on her pregnancy and on her health." (Boylan Aff. at ¶ 3). Based on that conversation, the prosecutor "had the distinct impression that Juror #3 would not be coming back." (Id.). Justice Wetzel asked defense counsel "whether the defendant would consent to proceeding with eleven jurors, and [the defense attorney] answered that he would not." (Id. at ¶ 4). According to the prosecutor, the defense attorney "did not suggest that the court delay declaring the mistrial." (Id.). Subsequently, the jurors indicated off the record that prior to the mistrial declaration the jury had been split either 6-to-6 or 7-to-5. (Id.).[2]

On January 17, 2008, the Appellate Division denied the petition without opinion. Matter of Richardson v. Wetzel, 47 A.D.3d 484, 849 N.Y.S.2d 188 (1st Dep't 2008). Petitioner then applied to the Appellate Division for reargument, and sought leave to appeal to the Court of Appeals. On April 22, 2008, the Appellate Division summarily denied reargument. Richardson v. Wetzel, M-1244 Ind. No. 1425/07 (1st Dep't Apr. 22, 2008), (available at Lyon's Decl. dated May 13, 2013, Ex. R). On April

---

[2] Petitioner also objected to the admission of Mr. Boylan's affirmation as containing matters outside the record. (Pet'r's Reply and Mot. to Strike 1-4).

29, 2008, the Court of Appeals denied leave to appeal. Richardson v. Wetzel, 10 N.Y.3d 708, 859 N.Y.S.2d 393 (2008).

## C. Guilty Plea and Sentencing

On February 19, 2009, petitioner pled guilty before the Hon. Richard Carruthers, S.C.J., to robbery in the second degree, pursuant to a negotiated plea agreement. The plea agreement recommended a sentence of seven years of incarceration, followed by five years post-release supervision. (Plea 15-24). The plea agreement also included a waiver of petitioner's right to appeal. (Id. at 14). On March 11, 2009, the trial court sentenced petitioner to the recommended seven-year term of incarceration and a five-year term of post-release supervision. (Sentencing Tr. 3).

## D. Direct Appeal

In the wake of Richardson's plea and sentencing, he filed a direct appeal to the First Department. He presented two grounds for review: (1) that certain physical evidence and identification testimony should have been suppressed prior to the trial because he had been arrested on an unfounded suspicion of panhandling (Pet'r's Appellate Br. 12), and (2) that the

8

trial court had declared a mistrial absent manifest necessity, and, as a result, his retrial should have been barred by the Double Jeopardy Clause of the Fifth Amendment. (Id. at 21). The State responded by arguing (1) that petitioner had waived his right to appeal in his plea agreement, and (2) that petitioner's double-jeopardy claim was barred by the doctrine of res judicata as it had been denied in the previous Article 78 petition. (Resp. Br. 10, 23).

On June 28, 2011, the Appellate Division affirmed petitioner's conviction. People v. Richardson, 85 A.D.3d 660, 925 N.Y.S.2d 825 (1st Dep't 2011). In doing so, the Court held that Richardson had waived his appeal rights in his plea agreement. In what it described as "an alternate holding", the Court rejected petitioner's suppression claim on the merits and held that the double jeopardy claim, which had already been rejected on the merits in the prior Article 78 proceeding, was barred by res judicata. Id.

Petitioner applied for leave to appeal to the Court of Appeals. On April 30, 2012, the Court of Appeals denied his application. People v. Richardson, 18 N.Y.3d 997, 945 N.Y.S.2d 652.

9

### E. The Petition

Petitioner filed his current petition with this court on January 30, 2013. He asserts only his double-jeopardy claim, arguing that "double jeopardy barred further proceedings due to the declaration of a mistrial, over counsel's objection, simply because a juror refused to continue serving based upon minor, unsubstantiated physical complaints." (Pet'r's Mem. 10). Respondent opposes, arguing that the denial of petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Resp't's Mem. 12).

### III.   ANALYSIS

We first describe the statutory limits on the scope of the habeas court's review of challenged state-court decisions. We then turn to the merits of petitioner's claim.

### A. Habeas Standard of Review

The stringency of federal habeas review under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") turns on whether the state courts have passed on the merits of the petitioner's claim, that is, whether the decision of the highest

state court to consider the claim is "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (discussing 28 U.S.C. § 2254(d)). If the state court has addressed the merits, then the petitioner may obtain relief only if the state court's ruling "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see, e.g., Bell v. Cone, 535 U.S. 685, 693-94 (2002); Williams v. Taylor, 529 U.S. 362, 412-13 (2000); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Brown v. Artuz, 283 F.3d 492, 498 (2d Cir. 2002). "[I]f the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed de novo.'" Dolphy v. Mantello, 552 F.3d 236, 238 (2d Cir. 2009) (quoting Spears v. Greiner, 459 F.3d 200, 203 (2d Cir. 2006)).

"Clearly established federal law 'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" Howard, 406

F.3d at 122 (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002)). "[A] decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Id. (alterations in original) (quoting Williams, 529 U.S. at 413).

What constitutes an "unreasonable application" of settled law is a somewhat murkier proposition. "'A federal court may not grant habeas simply because, in its independent judgment, the "relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Id. (quoting Fuller v. Gorczyk, 273 F.3d 212, 219 (2d Cir. 2001)). The Supreme Court observed in Williams that "unreasonable" did not mean "incorrect" or "erroneous," noting that the writ could issue under the "unreasonable application" provision only "if the state court identifies the correct governing legal principle from [Supreme] Court[ ] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 410-13. The Second Circuit has interpreted this language to mean that while "'[s]ome increment of incorrectness beyond error is required... the increment need not be great; otherwise habeas relief would be limited to state court decisions so far

12

off the mark as to suggest judicial incompetence.'" Monroe v. Kuhlman, 433 F.3d 236, 246 (2d Cir. 2006) (internal quotation marks omitted) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).

The Supreme Court's most recent decision on this issue reflects a seemingly narrower view of what constitutes an "unreasonable" application of federal law. It states that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S.Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "Under § 2254(d), a habeas court must determine what arguments or theories supported, or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. Under this more recent interpretation, a federal habeas court has "authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. Id. In other words, to demonstrate an "unreasonable" application of Supreme Court law, the habeas petitioner "must

show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

Even if "a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington, 131 S.Ct. at 784. In short, a decision on the merits need not elaborate on, or explain, the court's reasoning. Bierenbaum v. Graham, 607 F.3d 36, 48 (2d Cir. 2010).

As for the state court's factual findings, under the habeas statute "a determination of a factual issue made by a state court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Richard S. v. Carpinello, 589 F.3d 75, 80-81 (2d Cir. 2009); McKinney v. Artuz, 326 F.3d 87, 101 (2d Cir. 2003); see generally Rice v. Collins, 546 U.S. 333, 338-39 (2006).

In this case, both sides appear to agree that the limits on our review embodied in section 2254(d) apply to Richardson's claim. This appears to be entirely correct, since the Appellate

14

Division presumptively decided the merits of petitioner's Double Jeopardy claim on his Article 78 petition, a result seemingly confirmed on his direct appeal.

### B. **Double Jeopardy**

### 1. **Legal Standards**

A review of the legal standards applicable to declarations of mistrial readily demonstrates that the trial court's challenged decision and the affirmance of that decision by the Appellate Division was entirely defensible and plainly not an unreasonable application of Supreme Court precedent.

The seminal Supreme Court decision applying the Double Jeopardy Clause to a court's declaration of a mistrial is United States v. Perez, 22 U.S. 579 (1824). In Perez, the trial judge declared a mistrial when the jury failed to agree on a verdict. The Court explained that trial judges may declare a mistrial "whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity" for doing so, and that the decision to declare a mistrial is left to the "sound discretion" of the trial judge. Id. at 580. The Court in that case held that the inability of the jury to agree on a verdict

15

amounted to manifest necessity and therefore did not bar retrial of the defendant.[3]

The Supreme Court has explained that the "manifest necessity" standard "cannot be interpreted literally," and that a mistrial is proper when there is a "high degree" of necessity. Arizona v. Washington, 434 U.S. 497, 506 (1978). In deciding whether a mistrial is warranted, the High Court has expressly declined to require the "mechanical application" of a "rigid formula." Wade v. Hunter, 336 U.S. 684, 691 (1949). Consistent with Perez, trial court judges enjoy broad discretion in deciding whether to grant a mistrial. See, e.g., Illinois v. Somerville, 410 U.S. 458, 469 (1973); Gori v. United States, 367 U.S. 364, 369 (1961). Nonetheless, "[i]f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to him, the reason for such deference by an appellate court disappears." Renico v. Lett, 559 U.S. 766, 775 (2010) (quoting Washington, 434 U.S. at 510, n.28). Thus, "if the trial judge acts for reasons completely unrelated to the trial problem which purports to be the basis for the mistrial ruling, close appellate scrutiny is appropriate." Id. Similarly, "if a trial

---

[3] A jury's inability to reach a verdict is now considered the prototypical basis for a trial judge's decision to declare mistrial due to "manifest necessity." Oregon v. Kennedy, 456 U.S. 667, 672 (1982).

16

judge acts irrationally or irresponsibly... his action cannot be condoned." Id. (quoting Washington, 434 U.S. at 514).

As illustrated in the Supreme Court's decision in Renico, the deference normally extended to the trial judge in deciding whether to declare a mistrial is particularly broad in the context of a habeas challenge, in which the principle of federalism requires deference to the state courts' merits-based decisions. The petitioner in Renico argued that he was entitled to habeas relief because the state trial judge had abruptly declared a mistrial at the first sign of a potential jury deadlock. In its analysis, the Supreme Court acknowledged that the trial judge could have been more thorough before declaring a mistrial -- for example, the judge "could have asked the foreperson additional follow-up questions, granted additional time for further deliberations, or consulted with the prosecutor and defense counsel before acting" -- but it held that "[n]one [of these steps was required -- either under our double jeopardy precedents or, by extension, under AEDPA." Renico, 559 U.S. at 768.

In reaching this conclusion, the Court emphasized that if the state appellate court's interpretation of the record was merely plausible, it was not subject to second-guessing on

17

habeas review. "Because AEDPA authorizes federal courts to grant relief only when state courts act <u>unreasonably</u>, it follows that '[t]he more general the rule' at issue, and, thus, the greater the potential for reasoned disagreement among fair-minded judges, 'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.'" <u>Id.</u> at 776 (quoting <u>Yarborough,</u> 541 U.S. at 664) (emphasis in original). Since the standards for declaring a mistrial are defined in very general terms -- that is, whether the trial court acted beyond its broad discretion -- the state appellate court's affirmance is to be granted more deference. <u>Id.</u> Applying these principles, the <u>Renico</u> Court held that the Michigan State Supreme Court's conclusion that the trial judge had appropriately exercised sound discretion in declaring a mistrial was not unreasonable, even if it may have been the wrong decision. <u>Id.</u>, at 779.

## 2. Analysis

The record in this case indicates that the jurors appeared far from reaching a verdict when the judge dismissed them for the day on August 29, 2007. (Tr. 117). The next morning, Juror Three failed to report to court. (<u>Id.</u> 121). The trial judge reached out to her by telephone, and she informed him that she was suffering from a mild fever, that she was feeling very weak,

that she had had a troubled pregnancy and that the tensions from the jury deliberations were exacerbating the problems with her pregnancy. (Wetzel Aff. ¶ 7). Still, the judge attempted to persuade Juror Three to return to court, even offering her an escort by court personnel or a compensated taxi ride, but she insisted that she could not, and would not, return because her continued participation might imperil her already difficult pregnancy. (Wetzel Aff. ¶ 7). The judge stated on the record that he believed that the juror was "very sincere and sympathetic" and that she was "just not physically able to come down, she doesn't see that changing in the next day." (Tr. 121-22). Thus, the record confirms that the trial judge made reasonable efforts to obtain the juror's presence and ultimately was persuaded by the severity of her condition and the genuineness of her statements that she could and would not continue to deliberate. Only after being faced with this less-than-ideal situation, and the refusal of the defendant to consent to an eleven-person jury, did the judge determine that "the only option was to call a mistrial." (Tr. 122). In doing so, the judge complied with New York's requirement that a court must declare a mistrial if a juror is unqualified as a result of illness and if no alternate jurors are available. N.Y. Crim. Pro. L. § 270.35(1) (McKinney 2006).

Petitioner argues that the trial judge should have done more to substantiate Juror Three's claim that she was ill and unable to continue participating in jury deliberations. (Pet'r's Mem. 14-15). The Supreme Court, however, has never held that a juror's claim to be ill must be medically substantiated by the trial judge, nor has the High Court imposed a standard that dictates the severity of a juror's illness necessary to validate a mistrial declaration. To the contrary, the courts have held that a mistrial declaration due to an ill juror is granted the same high degree of deference as one involving a deadlocked jury. See Shaw v. Norris, 33 F.3d 958, 962-63 (8th Cir. 1994); United States v. Holley, 986 F.2d 100, 104 (5th Cir. 1993). Thus the courts have held as a general proposition that a juror's illness constitutes "manifest necessity" justifying a mistrial if there is no readily available alternative option. See, e.g., Shaw, 33 F.3d at 963 (mistrial declared when one juror reported feeling ill only a few hours after jury began deliberations); Holley, 986 F.2d at 103-04 (upholding as reasonable mistrial declaration after it was clear that ill juror would not be able to continue); United States v. D'Amato, 493 F.2d 359, 366 (2d Cir. 1974) (noting that the district court properly declared a mistrial when a juror became disqualified because of claustrophobia); Reed v. Smith, 2006 WL 929376, *5 (E.D.N.Y. Apr. 11, 2006) (holding that trial court acted reasonably in

20

determining that manifest necessity existed for declaring a mistrial when juror was dismissed because he suffered from claustrophobia); <u>Grandison v. Miller</u>, 1997 WL 793091, *5 (E.D.N.Y. Nov. 24, 1997) (juror suffering from shingles constituted manifest necessity for mistrial declaration); <u>see also</u> <u>United States v. Johnson</u>, 20 Fed. App'x. 81, 84 (2d Cir. 2001) (juror's call to the court secretary and the courtroom deputy to report that he was seriously ill provided the Court with sufficient information to reach an informed decision to discharge juror).[4]

The justification for declaring a mistrial is still more potent in this case because the judge was faced with a juror who not only was claiming illness, but also was apparently refusing to leave her home to attend the trial. When a juror reports feeling unwell, even though she is still present in the court, the justification for excusing her rests on the obvious concern that "illness can affect a juror's ability to concentrate on and weigh the evidence in a case." <u>Grandison</u>, 1997 WL 793091, at *4. "An ill juror can compromise the integrity of the deliberation

---

[4] Petitioner relies heavily on <u>People v. Michael</u>, 48 N.Y.2d 1, 420 N.Y.S.2d 371 (1979), to support his claim. The <u>Michael</u> decision, however, does not constitute "clearly established federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d). Thus, that decision cannot form the basis for habeas relief.

process, as it may impact his or her ability to assess evidence in a case, and increase pressure to 'acquiesce in the conclusions of fellow jurors in order to escape more readily from the discomforts of the jury room.'" Reed, 2006 WL 929376, at *4 (quoting Grandison, 1997 WL 793091, at *4).[5] In this case, the judge was also faced with the fact that the juror was refusing to come to court, a circumstance that made a resumption of the trial still less feasible.[6]

Petitioner further argues that the court should have considered a temporary adjournment instead of declaring a mistrial. (Pet'r's Mem. 19). He contends that the court improperly failed to consider this option solely because the delay would have interfered with another juror's travel plans. This argument is also unavailing.

_____

[5] While it is possible that a juror may fabricate feeling "ill" in order to be relieved of his jury duty, "a trial judge is, in fact, uniquely situated to observe firsthand a juror's condition and to assess the extent of any physical distress," Grandison, 1997 WL 793091, at *5, and this court is certainly in no position to second-guess such an assessment.

[6] In theory a judge could order the juror to report, on pain of contempt, see Matter of Diane D., 161 Misc. 2d 861, 862, 615 N.Y.S.2d 607, 609 (Sup. Ct. N.Y. Cnty. 1994), and, perhaps, direct law-enforcement authorities to forcibly bring her in, but that is scarcely a prescription for ensuring the presence of a juror willing to participate in a collaborative effort to render a just verdict.

Although a juror's personal or financial inconvenience alone is generally insufficient to establish "manifest necessity," Cook v. Marshall, 2011 WL 744765, at *4 (S.D.N.Y. Feb. 22, 2011),[7] it does not appear that this particular consideration was the driving force of the court's decision. The record reflects that the trial judge not only believed that Juror Three was "just not physically able to come down", but also that "she [did not] see that changing in the next day." (Tr. 121). Since she reported having an already troubled pregnancy, it was hardly unreasonable for the judge to find her return in the immediate future unlikely. In short, even if he had ignored the other juror's travel plans, he could reasonably have decided that an adjournment was not a viable option. Furthermore, a trial judge is not required "to make explicit findings of 'manifest necessity' or 'articulate on the record all the factors' informing his discretion.'" Renico 559 U.S. at 767 (quoting Washington, 434 U.S. at 517).

In sum, the Appellate Division's determination rejecting petitioner's claim was not unreasonable. Plainly the trial court

---

[7] There are instances, however, where a juror's personal commitments, including travel plans, can be a factor considered by the trial court, particularly when a juror states that he cannot assure he could be impartial or fair if the trial would interfere with his personal commitments. Cook, 2011 WL 744765, at *4.

did not act "irresponsibly" or "irrationally" in making its decision. See Washington, 434 U.S. at 514.

Finally, we note that petitioner argues that it was improper for the Appellate Division to consider the affirmations submitted by the prosecutor and the trial judge in opposition to his Article 78 application. (See Pet'r's Mem. 20). This assertion adds nothing to his claim.

The propriety of a state appellate court's consideration of submissions made to it is governed solely by state-law practice. Hence, even if the appellate panel had transgressed an applicable state-court rule, that would not affect our merits analysis, which is limited to review of claimed violations of federal law. See Estelle v. McGuire, 502 U.S. 62, 67 (1991). In any event, there was nothing improper in the Appellate Division's consideration of the evidence submitted to it during the Article 78 proceeding.

For a petition seeking a writ of prohibition, the question presented for judicial review is whether "the body or officer proceeded, is proceeding or is about to proceed without or in excess of jurisdiction," CPLR § 7803(2), and, for that purpose, the court may consider affidavits containing information outside

24

the record. See, e.g., People v. Christensen, 77 A.D.3d 174, 182, 906 N.Y.S.2d 301, 307 (2d Dep't 2010); Oliver v. Justices of N.Y. Sup. Ct., 36 N.Y.2d 53, 56-57, 364 N.Y.S.2d 874, 876-77 (1974); Proskin v. Cnty. Ct. of Albany Cnt., 30 N.Y.2d 15, 19, 330 N.Y.S.2d 44, 46 (1972); Tuite v. Shaw, 49 A.D.2d 737, 737-40, 372 N.Y.S.2d 219, 220-25 (2d Dep't 1975). In this case, because Richardson was seeking a writ to prohibit retrial, new evidence was admissible for consideration by the Appellate Division. Moreover, the evidence submitted by the trial judge and the prosecutor for the Article 78 proceeding essentially reiterated facts already articulated in the record and, as such, presumably would have had little impact on the ultimate decision of the Appellate Division to deny Richardson's petition. In other words, had the admission of extrinsic evidence amounted to error -- which it did not -- the error would have been harmless.

## CONCLUSION

For the reasons noted, we recommend that the writ be denied and the petition dismissed with prejudice. In the absence of any issue meriting appellate review, we further recommend that the court deny a certificate of appealability. See 28 U.S.C. § 2253(c).

25

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable William H. Pauley III, Room 2210, 500 Pearl Street, New York, New York, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

DATED: New York, New York
       December 23, 2013


                    RESPECTFULLY SUBMITTED,


                    _____
                    MICHAEL H. DOLINGER
                    UNITED STATES MAGISTRATE JUDGE


26

Copies of the foregoing Report and Recommendation have been
mailed today to:

Paul Bernard Lyons, Esq.
New York State Office of the Attorney General
120 Broadway
New York, NY 10271

Katheryne M. Martone, Esq.
Legal Aid Society
Criminal Appeals Bureau
90 Church Street
New York, NY 10007